UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOEL DIAZ,

     Petitioner,

v.                       Case No.: 2:14-cv-91-JES-MRM

SECRETARY, DOC,

     Respondent.

_____

## OPINION AND ORDER

This cause is before the Court on a 28 U.S.C. § 2254 petition for habeas corpus relief filed by Petitioner Joel Diaz ("Petitioner" or "Diaz"). (Doc. 1, filed Feb. 14, 2014).[1] Upon consideration of the petition, the Court ordered Respondent to show cause why the relief sought should not be granted. (Doc. 14). Thereafter, Diaz filed a response in compliance with this Court's instructions and with the Rules Governing Section 2254 Cases in the United States District Courts. (Doc. 26). Diaz filed a reply, and the petition is ripe for review. (Doc. 31).

Upon consideration of the pleadings and the state court record, the Court concludes that each of Diaz's claims that were not rendered moot by his resentencing must be dismissed as procedurally barred or denied on the merits.

---

[1] When he filed the petition in 2014, Diaz was a death row inmate. (Doc. 1). On September 1, 2017, the state court re-sentenced Diaz to life in prison, and he is no longer under a sentence of death. (Doc. 64 at 1).

## I.   Background and Procedural History[2]

On November 18, 1997, a grand jury indicted Diaz for:  (1) the premeditated murder of Charles Shaw; (2) the attempted first-degree murder of Lissa Shaw; and (3) the aggravated assault with a firearm upon Roy Isakson.  (Ex. A1 at 7-8).  The Supreme Court of Florida outlined the facts surrounding the crimes in its initial opinion on direct appeal:

> Diaz and Lissa Shaw dated for about two years. During the second year of their relationship, they lived in Diaz's home with Lissa's young daughter. The relationship proved "rocky," however, and around August 1997 Lissa moved in with her parents, Charles and Barbara Shaw.  After she moved out, Diaz tried to see her, but she refused all contact. The two last spoke to each other in September 1997.
>
> On October 6, Diaz purchased a Rossi .38 special revolver from a local pawn shop. He was eager to buy the gun, but because of a mandatory three-day waiting period, could not take it with him.  Three days later, Diaz returned to the pawn shop to retrieve the gun, but it could not be released to him because his background check remained pending. Diaz was irritated, and continued to call the shop nearly every day until he was cleared. On October 16, Diaz finally was allowed to take the gun.
>
> On October 27, Diaz asked his brother Jose, who was living with him at the time, for a ride to a friend's house the next morning. Sometime that night or early the next morning, Diaz wrote a letter to his brother, which the police later discovered in his bedroom. It reads:
>
> > Jose [f]irst I want to apologize for using you or to lieing to you to take me where you did

---

[2] Only the background and procedural history necessary to address the guilt-phase claims raised in Diaz's habeas petition are set forth below.  The citations to exhibits are to those provided to the Court in paper form on September 17, 2014.

I felt so bad but there was no other way.
Theres no way to explain what I have to do but
I have to confront the woman who betrayed me
and ask her why because not knowing is literly
[sic] killing me. What happens then is up to
her.

If what happen is what I predict than I want
you to tell our family that I love them so
much. Believe me I regret having to do this
and dieing knowing I broke my moms heart and
my makes it even harder but I cant go on like
this it's to much pain. Well I guess that all
theres to say I love you all.

Joel

P.S. Someone let my dad know just because we
werent close doesn't mean I don't love him
because I do.

At 5:30 a.m. on October 28, Diaz's brother and his
brother's girlfriend drove him to the entrance of
the Cross Creek Estates subdivision, where the
Shaws lived. Diaz carried his new gun, which was
loaded, and replacement ammunition in his pocket.
Diaz walked to the Shaws' house and waited outside
for about ten minutes.

At 6:30 a.m., Lissa Shaw left for work. She entered
her car, which was parked in the garage, started
the engine, and remotely opened the garage door.
She saw someone slip under the garage door, and
when she turned, Diaz stood at her window, pointing
the gun at her head. He told her to get out of the
car.  She pleaded with him not to hurt her.  When
she saw that "the situation was not going
anywhere," she told him, "Okay, okay, hold on a
second, let me get my stuff," and leaned down as if
retrieving personal items. She then shoved the gear
into reverse and stepped on the gas pedal. Diaz
started shooting. Lissa heard three shots, but did
not realize she had been hit. As she continued
backing out, the car struck an island behind the
driveway. She then put the car into forward drive.
As she drove away, she saw Diaz in the front yard
pointing the gun at her father, Charles Shaw.
Charles was about five feet from Diaz, pointing and
walking toward him. Lissa drove herself to the

hospital where it was discovered she had been shot in the neck and shoulder.

Charles and Diaz then had some sort of confrontation in the front yard and an altercation in the garage, resulting in Diaz chasing Charles into the master bedroom where Barbara was lying in bed.  A quadriplegic, Barbara could not move from the bed.

As the two men moved through the house, Barbara heard Charles saying, "Calm down, put it down, come on, calm down, take it easy." Barbara was able to roll back to see Diaz standing in the bedroom with a gun.  He was standing on one side of a chest of drawers, closer to the door, while Charles was standing on the other side of the chest, closer to the bathroom.  Charles talked to Diaz, telling him to calm down and put down the gun. Diaz held the gun with two hands, pointing it straight at Charles, about six to eight inches from Charles's chest.  Diaz pulled the trigger, but the gun, out of ammunition, only clicked.  Charles visibly relaxed, but Diaz reloaded the gun.  When Charles realized Diaz was reloading, he ran into the bathroom. Diaz followed. As Charles turned to face him, Diaz fired three shots.  Charles's knees buckled, and he grabbed his midsection and fell face first to the floor.

Diaz went back into the bedroom and stood beside Barbara, holding the gun. Barbara screamed, "Why did you do this?"  Diaz answered that Charles deserved to die.  He stood in the bedroom from 30 seconds to a minute, then returned to the bathroom, bent over Charles's body, extended his right arm, and shot Charles again.  He then moved his arm left, which Barbara judged to be toward Charles's head, and shot again.  Diaz returned to the bedroom and, according to Barbara, said, "If that bitch of a daughter of yours, if I could have got her, I wouldn't have had to kill your husband."

Diaz remained in the house between 45 minutes and an hour.  He spent some of this time talking to Barbara in the bedroom, where he passed the gun from hand to hand and unloaded and loaded the gun about three or four times.  He remained in the house until the police arrived and arrested him.[1]

4

> FN1. At some point during the incident, a neighbor walked up to the Shaw's house. When he approached, both the garage door and the door leading from the garage to the inside of the house were open. The man saw an individual pacing back and forth inside the home, and as he entered the garage, he called out for Charles. Diaz then stepped into the garage, pointed the gun at the man, and said, "Get the f--- out of here." The neighbor returned to this house and called police.
>
> The jury found Diaz guilty of the first-degree murder of Charles Shaw, the attempted first-degree murder of Lissa Shaw, and aggravated assault with a firearm on the neighbor. After penalty phase proceedings, the jury recommended a sentence of death by a vote of nine to three. After a Spencer hearing, the trial court found three aggravating circumstances and five statutory mitigating circumstances, and sentenced Diaz to death.

Diaz v. State, 860 So. 2d 960, 963-64 (Fla. 2003) ("Diaz I") (footnotes 2, 3, and 4 omitted). The jury found Diaz guilty as charged. (Ex. A4 at 84-86). The trial court sentenced Diaz to death for the murder of Charles Shaw, 151 months in prison for the attempted murder of Lissa Shaw, and five years in prison for aggravated assault of Roy Isakson. (Ex. A5 at 196-97).

Diaz raised four claims on direct appeal. (Ex. A13). In Issue One, Diaz argued that the circumstantial evidence presented at trial "tended to corroborate [Diaz's] testimony that he was struck in the face during an altercation with Mr. Shaw in the garage just prior to the homicide." (Ex. A13 at 45-54). Issues Two and Three related to alleged errors in the penalty phase of his trial. (Id. at 54-93). In Issue Four, Diaz argued that the

death sentence was disproportionate to his crime.  (Id. at 93-96).
The Florida Supreme Court concluded that Diaz's first claim—that
the circumstantial evidence corroborated his testimony that he
lost control after Charles Shaw struck him in the garage—was
essentially a claim that "this circumstantial evidence negates a
finding of the heinous, atrocious, or cruel (HAC) and cold,
calculated, and premeditated (CCP) aggravating factors and
therefore affects the proportionality of his death sentence."
Diaz I, 860 So. 2d at 965 n.5.  Therefore, the court "address[ed]
[Issue One] in the remaining issues."  Id.

The Florida Supreme Court found that the evidence did not
support a finding that the murder was especially heinous,
atrocious, or cruel, but concluded that the error was harmless,
given the other aggravating and mitigating circumstances.  (Ex.
A15); Diaz I, 860 So. 2d at 965-68.  In his motion for rehearing,
Diaz argued, for the first time, that Florida's capital sentencing
scheme was unconstitutional under Ring v. Arizona, 536 U.S. 584
(2002).  (Ex. A16).  The Florida Supreme Court denied the motion
for rehearing.  (Ex. A17).  The United States Supreme Court denied
Diaz's petition for writ of certiorari. (Ex. B3); Diaz v. Florida,
541 U.S. 1011 (2004).

Thereafter, Diaz filed a motion and an amended motion for
postconviction relief under Rule 3.851 of the Florida Rules of
Criminal Procedure (collectively, "Rule 3.851 Motion").  In his

Rule 3.851 Motion, Diaz raised fifteen claims and numerous subclaims. (Ex. C84: 13387-426.)  After conducting an evidentiary hearing (Ex. C93-C96), the postconviction court denied the Rule 3.851 Motion in a written opinion. (Ex. C84 at 13384-426).  State v. Diaz, No. 97-CF-3305, 2011 WL 11709347 (Fla. Cir. Cr. Apr. 8, 2011).  Diaz appealed (Ex. C103), and the Florida Supreme Court denied all relief in a written opinion.  (Ex. C108); Diaz v. State, 132 So. 3d 93 (Fla. 2013) ("Diaz II").

Diaz, through appointed counsel, filed his federal petition for writ of habeas corpus on February 14, 2014.  (Doc. 1). Subsequently, the Lee County State Circuit Court, in and for the Twentieth Judicial Circuit, resentenced Diaz to life in prison. (Doc. 63 at 1).  Therefore, this Court can no longer grant Diaz any relief on his penalty-phase claims, and those claims are now moot.  See Rimmer v. Sec'y, Fla. Dep't of Corr., 876 F.3d 1039, 1052 n.8 (11th Cir. 2017) (recognizing that a claim regarding error at the penalty phase of trial was moot after the petitioner was resentenced to life in prison).  However, Diaz, now proceeding pro se, wishes to continue his challenges to the guilt-phase portion of his trial.  (Doc. 64 at 2).

## II.  Governing Legal Principles

### A.  The Antiterrorism Effective Death Penalty Act ("AEDPA")

Under the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court

unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d)(1)-(2).  A state court's summary rejection of

a claim, even without explanation, qualifies as an adjudication on

the merits and warrants deference.  Ferguson v. Culliver, 527 F.3d

1144, 1146 (11th Cir. 2008) (citing Wright v. Moore, 278 F.3d 1245,

1253-54 (11th Cir. 2002)).

### B.  Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established

a two-part test for determining whether a convicted person is

entitled to relief on the ground that his counsel rendered

ineffective assistance.  466 U.S. 668, 687-88 (1984).  A

petitioner must establish that counsel's performance was deficient

and fell below an objective standard of reasonableness and that

the deficient performance prejudiced the defense.  Id.

The focus of inquiry under Strickland's performance prong is

"reasonableness under prevailing professional norms."  Id. at 688.

In reviewing counsel's performance, a court must adhere to a strong

presumption that "counsel's conduct falls within the wide range of

reasonable professional assistance."  Id. at 689 (citation

omitted).   A court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny.  Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).   Proving Strickland prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.

## C.   Exhaustion and Procedural Default

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b)(1).  Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]"  Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971) (some internal quotation marks omitted)). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim.  Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998).   Under the similar doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to

9

hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A petitioner can avoid the application of the exhaustion or procedural default rules by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation. Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179-80 (11th Cir. 2010). To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate a reasonable probability the outcome of the proceeding would have differed. Crawford v. Head, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" Murray v. Carrier, 477 U.S. 478, 479-80 (1986).

### III. Discussion

Diaz raises five separate grounds (and numerous subclaims) for relief in his petition:

> **Ground I:** Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel at trial rendering the

10

result of both the guilt and penalty phases unreliable.

**Ground II:** The [Florida Supreme Court's] harmless error analysis [as it applied to the heinous, atrocious, and cruel aggravator] was contrary to and/or an unreasonable application of clearly established Eighth and Fourteenth Amendment jurisprudence as set forth by the U.S. Supreme Court.

**Ground III:** Joel Diaz was deprived of his constitutional right to a fair and impartial jury due to juror misconduct and/or the state's failure to disclose material information concerning the juror's criminal history.

**Ground IV:** Florida's capital sentencing statute violates the Sixth, Eighth, and Fourteenth amendments under Ring v. Arizona.

**Ground V:** Joel Diaz is mentally retarded/intellectually disabled, therefore he is ineligible for execution under the Eighth Amendment.

(Doc. 1 at 9-64). Upon review of the petition, the Court concludes that Grounds II, IV, and V are moot because they are directed solely towards errors in the penalty phase of Diaz's trial. Accordingly, the Court will address only Ground I (in part) and Ground III of this petition.

**A.   Ground I (Ineffective Assistance of Counsel)**

Diaz had at least three attorneys during his case. Assistant Public Defender Ken Garber ("Garber") was appointed to the case shortly after his arrest. (Doc. 1 at 12). After Diaz filed a motion to have Garber removed from the case, the trial court appointed private attorney J. Franklin Porter ("Porter") to

11

represent him.   (Id. at 16).   Private attorney Neil Potter
("Potter") was appointed to assist Porter, particularly in the
penalty phase of his trial.   (Id. at 19).

When Diaz raised his ineffective assistance of counsel claims
in his Rule 3.851 Motion, the postconviction court found that his
specific allegations were undefined and difficult to address.   The
court noted that the guilt phase and penalty-phase claims
"consist[] of a litany of complaints, which [Diaz] failed to
present in the form of separately defined and enumerated claims."
(Ex. C84 at 13396, 13416).   The court described Diaz's arguments
regarding trial counsel's trial preparation as "a jumbled list of
reasons that trial counsel was ineffective for failing to
adequately investigate and prepare."   (Id. at 13400).   As noted
by Respondent, Diaz now exacerbates "this organizational
difficulty by combining his multitude of ineffective assistance of
guilt-phase claims with his ineffective assistance of penalty-
phase claims into a single claim."   (Doc. 26 at 38).

It is difficult to parse the specific ineffective assistance
claims that Diaz now attempts to raise in his section 2254 petition
and supporting memorandum.   However, when it addressed Diaz's
appeal of the postconviction court's denial of his Rule 3.851
Motion, the Florida Supreme Court separated Diaz's ineffective
assistance claims into five guilt-phase subclaims and eleven
penalty-phase subclaims.   The Florida Supreme Court determined

that Diaz had alleged that Porter and Potter were ineffective during the guilt phase of his trial for:

      a.   failing to subpoena an FDLE crime lab analyst and being unable to get the analyst's report admitted into evidence;

      b.   failing to prepare psychologist Dr. Kling to testify;

      c.   failing to object to Dr. Keown's testimony and report regarding the Anger Styles Quiz;

      d.   allowing Diaz to be examined by Dr. Keown in the presence of law enforcement and outside the presence of counsel; and[3]

      e.   failing to interview potential witness Melissa Plourde.

Diaz II, 132 So. 2d at 106.  Each of these subclaims was addressed and rejected by both the postconviction court and the Florida Supreme Court. (Ex. C84); Diaz II.  Accordingly, the subclaims are exhausted.  With the exception of subclaim (d), which appears to have been abandoned, the Court will review these guilt-phase subclaims separately to determine whether Diaz has demonstrated entitlement to federal habeas corpus relief under 28 U.S.C. § 2254.

---

[3] This subclaim was denied by the Florida Supreme Court on the ground that Diaz "did not assert how his examination with Dr. Keown would have gone differently had counsel been present or how he was prejudiced as a result of counsel's lack of presence at his examination." Diaz II, 132 So. 3d at 108.  Diaz presents no argument refuting the state court's adjudication of this subclaim in this federal habeas petition, supporting memorandum, or reply. Accordingly, Diaz appears to have abandoned subclaim (d), and it will not be further addressed in this Order.

### 1.   Subclaims (a), (b), and (e)

In subclaims (a), (b), and (e), Diaz asserts that Porter and/or Potter failed to conduct an adequate pre-trial investigation. (Doc. 2 at 10). Diaz notes that Garber, his initial defense attorney, "set the stage by beginning an extensive investigation of both the crime and his client's life history." (Id.) Garber had a psychologist appointed to evaluate Diaz and asked the court to appoint mental health experts to help the legal team and the jury "understand the Mexican American subculture in Southwest Florida." (Id. at 11). Diaz, however, did not trust Garber and had him removed from the case. (Id.) Diaz now faults his new attorneys (Porter and Potter) for failing to embrace Garber's strategy of focusing "on the particular characteristics of the individual." (Id.) Diaz asserts that Potter did little investigation to show that he (Diaz) could not have formed the heightened premeditation to commit first degree murder. (Id. at 11). Diaz argues that "[t]rial counsel failed to subpoena witnesses, did not prepare defense witnesses for their testimony, failed to keep out inadmissible and damaging evidence, and failed to present a meaningful case in mitigation before the jury." (Id. at 11-12).

> **(a)   Counsel was not ineffective for failing to subpoena FDLE crime lab analyst Darren Esposito or admit the FDLE report into evidence.**

In subclaim (a), Diaz urges that Garber had planned to call

FDLE analyst Darren Esposito as a witness to testify that Diaz's DNA was found in blood droplets throughout the victim's home and under Charles Shaw's fingernails. (Doc. 1 at 13). Garber believed that this evidence could support Diaz's claim that: (1) he was retreating when Charles Shaw hit him in the face; and (2) he went to the home to try and understand why Lissa Shaw broke up with him. (Id.) Diaz asserts that "Garber thought that getting the FDLE report that showed that the blood droplets belonged to Diaz was a positive development in the case. But [Diaz] saw it differently; he was upset that Garber needed outside evidence before he believed Diaz's version as to how he ended up shooting and killing Charles Shaw." (Id. at 15-16). Diaz had Garber removed from the case and the court appointed private attorney J. Franklin Porter to represent him. (Id.) Garber sent a letter to Porter "informing him that he had previously subpoenaed analyst Darren Esposito for trial because the FDLE reports showed that Joel Diaz had been in many areas of the Shaw home." (Id. at 17). Diaz asserts the following:

> Porter's intention was to establish a break between Joel Diaz's shooting at Lissa Shaw and the subsequent physical confrontation with the father, Charles Shaw; this is why he presented the booking photo showing the mark on his client's face. However, when it came time to show that it was Joel Diaz's blood throughout the home as well as his DNA under the fingernails of the victim, he apparently forgot to subpoena and make arrangements for the FDLE analyst Darren Esposito to travel from Tampa to Ft. Myers to testify. Instead,

> Porter made a clumsy attempt to get the
> results of the lab report into evidence
> through crime scene technician Robert Walker.
> However, the State objected based on hearsay
> and "Frye." Trial counsel was unsuccessful
> in getting the information contained in the
> FDLE reports before the jury.

(Doc. 1 at 21) (citations to the record omitted). Diaz raised
this claim in his Rule 3.851 Motion, and after holding an
evidentiary hearing, at which Porter and Potter testified, the
postconviction court rejected the claim on both Strickland prongs
as follows:

> Defendant argues that the evidence of
> Defendant's DNA in blood droplets found in the
> home was not presented to corroborate
> Defendant's story that the murder was not
> premeditated, but was a result of a
> confrontation with the victim. Defendant
> contends that trial counsel should have
> presented the report by FDLE lab analyst Agent
> Esposito, and was ineffective for failing to
> do so.
>
> The record reflects that Mr. Porter did
> question Agent Walker regarding the blood
> droplet evidence he submitted to FDLE for
> testing, and that the State objected to the
> results of that testing and admission of the
> report due to lack of foundation, with a
> comment that it would also require a [Frye]
> hearing. Ms. Gonzalez [the prosecutor]
> testified during the evidentiary hearing that
> she did not know why she made the objection.
> Mr. Porter did not recall why Agent Esposito
> was not called as a witness. Mr. Potter
> testified at the evidentiary hearing that he
> thought the DNA evidence was important at
> first, but that it would have gone nowhere
> because it only supported a self-defense
> claim, and there was no self-defense in this
> case. Mr. Potter believed that the defense did
> not call Agent Esposito because he was listed

16

as a State witness, and they may have expected
to be able to cross-examine him, but the State
did not call him, and he was not present.

Based on the foregoing, the Court finds
counsel was not deficient. Even had counsel's
performance somehow been deficient, Defendant
cannot show prejudice. The only testimony that
the victim struck Defendant is from Defendant
himself.  However, Defendant did not shoot the
victim during this alleged fight.  Defendant
shot the victim after the victim ran from
Defendant into his home and was cowering from
him in the bathroom.  Even if the shooting had
been a result of the confrontation, Defendant
would not have been justified in using deadly
force to meet non-deadly force. The evidence
of Defendant's blood in the home, even if
admitted, would not have corroborated his
defense, and there is no reasonable
probability that admission of this evidence
would have changed the outcome. Defendant has
failed to meet his burden as to either prong
of Strickland.

(Ex. C84 at 13408-09) (citations to the record omitted).  Diaz

appealed the ruling, but the Florida Supreme Court affirmed,

specifically finding:

We agree with the postconviction court's
conclusion that Diaz's trial counsel did not
perform ineffectively when they failed to
admit the blood evidence, which would not have
corroborated a viable defense. The FDLE lab
report would have had minimal impact on Diaz's
insanity defense. The report would have merely
indicated that Diaz's blood was found in
various places throughout the Shaw home.
However, it would not have demonstrated that
Diaz's blood was found throughout the home
because of injuries inflicted upon him by
Charles Shaw or supported the idea that Diaz
was insane. Thus, Diaz is not entitled to
relief on this claim.

Diaz II, 132 So. 3d at 107.  Diaz now urges that the state courts

17

"unreasonably focused on the FDLE lab report, instead of realizing that the original plan was to have Esposito testify" and unreasonably determined that the evidence would not have demonstrated that Diaz's blood was found in the Shaw's home because of injuries inflicted upon him by Charles Shaw.  (Doc. 2 at 44).[4]

The Court finds that the Florida Supreme Court reasonably applied Strickland to this claim when it concluded that Diaz failed to establish guilt-phase prejudice from Porter's failure to introduce additional evidence suggesting that the victim had struggled with Diaz in the garage.  Diaz testified at trial that he had struggled with Charles Shaw in the garage, and that Mr. Shaw had "attacked" him while trying to wrestle the gun away from him.  (Ex. A10 at 618).  Diaz stated that, after Mr. Shaw hit him,

---

[4] Before addressing the specific claims rejected by the state courts, Diaz complains that "the Florida Supreme Court separated the numerous examples of substandard performance into subclaims and addressed them individually in a superficial, piecemeal, and, in some instances, absurd fashion without considering the totality contrary to clearly established federal law."  (Doc. 2 at 13-14.)  Diaz seems to argue that the state courts incorrectly rejected his guilt-phase claims on Strickland's prejudice prong by looking only at the effect of Porter's errors on the verdict rather than on the penalty because "[n]owhere in the Florida Supreme Court opinion denying collateral relief is a recognition that the evidence presented in the guilt phase with respect to planning and premeditation was the same evidence upon which the State relied to support the CCP aggravator."  (Id. at 14.)  Any claim that the state courts overlooked the effect of trial counsels' errors on the penalty phase of his trial was mooted by Diaz's resentencing.  Therefore, this Court will consider only the possible effect of trial counsel's alleged errors on the outcome of the guilt-phase portion of Diaz's  trial.

he "lost it" but Diaz did not shoot Mr. Shaw immediately because
he ran away. (Id. at 620).  Diaz testified that he followed Mr.
Shaw into the bathroom and "emptied" his gun.  (Id. at 624–625).
Barbara Shaw, who witnessed the shooting, testified that Diaz
followed her husband into the bedroom and attempted to shoot him,
but the gun did not fire. (Ex. A8 at 252).  Diaz reloaded the gun
and followed Mr. Shaw into the bathroom where he shot him three
times.  (Id. at 254).  After shooting Mr. Shaw, Diaz left the
bathroom and spoke with Mrs. Shaw, telling her that her husband
deserved to die.  (Id. at 254).  A minute or two later, Diaz
returned to the bathroom and shot Mr. Shaw again.  (Id. at 255).
Mrs. Shaw testified that Charles Shaw had made no overt movements
toward Diaz after he had followed him into the house.  (Id. at
277–78).

At the evidentiary hearing on this claim, Porter stated that
the drops of blood found in the Shaw home would have proved only
that Diaz was bleeding and had been in those parts of the home.
(Ex. C95 at 454).  Porter did not believe the drops would have
proved self-defense; rather, they would have shown only that Diaz
had gone to other portions of the house after killing Mr. Shaw.
(Id. at 464, 468).  Neil Potter also testified at the evidentiary
hearing that, although the defense had subpoenaed Darren Esposito,
he had excused Esposito from testifying, presumably[5] because

---

[5] Potter could not "specifically remember" exactly why the

Esposito's testimony "would have gone nowhere." (<u>Id.</u> at 561-62).
Potter noted that "the only reason to bring that in would be to
propound the defense of self-defense, and there is no defense of
self-defense.  So why drag the guy down here from Tampa to go
through that when, in fact, it wasn't going to go anywhere[?]"
(<u>Id.</u> at 562).

Given the overwhelming evidence of Diaz's guilt and defense
counsel's evidentiary hearing testimony that there was no viable
self-defense argument to be made in this case, there was simply no
possibility of a different outcome at the guilt phase portion of
Diaz's trial, even had defense counsel introduced evidence—whether
in the form of Esposito's testimony or the FDLE lab report—to
corroborate Diaz's testimony that he had struggled with the victim
in the garage <u>before</u> following him into the house, cornering him
in the bathroom, and killing him.  Notably, Diaz does not now make
this argument.  Rather, he complains that the FDLE evidence would
have been useful in the <u>penalty</u> phase of his trial, arguing that
"[w]hile [Esposito's] testimony may not have provided a legal basis
for self-defense or insanity, the jury may well have considered
the fact of the physical confrontation in mitigation of the death
sentence—this possibility was never considered by the state
courts."  (Doc. 2 at 44)  In his reply, Diaz notes:

---

defense had excused Esposito, but testified that "there had to be
a reason." (Ex. C95 at 561).

> Of course, the Petitioner agrees that this was
> not a true self-defense case and that there
> was no **legal** justification for the murder. He
> has never argued otherwise. The point is that
> the altercation in the garage was a break in
> the action such that the heightened level of
> premedication required for [the CCP
> aggravator] could not possible be transferred.
> The problem is that trial counsel only half
> heartedly pursued this defense to the point
> that they forgot to subpoena the one witness
> who could corroborate their client's version
> of events.

(Doc. 31 at 10) (emphasis in original). Finally, Diaz concedes

that "[w]ith respect to prejudice, it is indeed unlikely that the

testimony from Esposito or the introduction of the color

photographs of the crime scene would have impacted the guilty

verdict." (Id. at 39).

To the extent Diaz continues to urge prejudice at the guilt-

phase portion of trial from defense counsels' alleged failure to

introduce additional evidence of a struggle between Diaz and

Charles Shaw, the Court finds that the state courts' rejection of

this claim was neither contrary to Strickland nor based upon an

unreasonable determination of the facts in light of the evidence

presented in the state court proceedings. Accordingly,

subclaim(a) is denied. 28 U.S.C. § 2254(d).

> **(b)   Counsel was not ineffective for failing
>         to better prepare Dr. Kling to testify at
>         the guilt-phase portion of Diaz's trial.**

Diaz asserts that trial counsel did not properly investigate

and prepare Dr. Paul Kling for his guilt-phase testimony in support

21

of the insanity defense.  (Doc. 2 at 41–42).  Psychologist Dr.
Paul Kling was appointed pre-trial to evaluate Diaz for competency
and sanity.  (Doc. 1 at 6).  Initially, Dr. Kling opined that Diaz
suffered from anxiety and depression, but was competent when he
killed Charles Shaw.  (Id. at 14.)  After obtaining more
information surrounding the events leading up to the crimes, Dr.
Kling changed his opinion and determined that Diaz was not
competent at the time of the killing.  (Id. at 15).  Dr. Kling
further found that the crimes were not premeditated.  (Id.)  Diaz
describes Dr. Kling's testimony as follows:

> Defense counsel put Dr. Paul Kling on the
> stand to establish that Joel Diaz was not
> guilty by reason of insanity at the time of
> the crime.  But because Porter did not spend
> time preparing either himself or Dr. Kling
> prior to trial, the mental health defense was
> a disaster.  In his second report, Dr. Kling
> had opined that the crime was not
> premeditated, and that Diaz met the criterion
> to support a finding that the "capital offense
> was committed while the defendant was under
> the influence of extreme mental or emotional
> disturbance."  Before Dr. Kling took the
> stand, the prosecutor argued that it would not
> be appropriate for him to discuss
> premeditation or the mitigating factors
> because those were matters for the jury to
> determine.  The judge rejected that argument
> and ruled that Dr. Kling would be allowed to
> opine on ultimate issues.
>
> Just after Dr. Kling took the stand, the fire
> alarm sounded and there was a thirty minute
> break.  Thereafter, Dr. Kling was unable to
> explain what materials he reviewed that
> prompted him to change his opinion.  He did
> not remember that he reviewed the defense
> depositions that mentioned Diaz's bizarre

behavior after the shooting before he issued
his first report, when he actually reviewed
the depositions seven months after the first
report. During cross examination, the State
pointed out that Dr. Kling was never provided
with adequate background information and that
he had forgotten key details. Dr. Kling did
not know or remember that Diaz had purchased
a gun before the shooting. Dr. Kling did not
remember that Diaz asked his brother for a
ride to the entrance of the gated-community
and then walked to the Shaw residence. Dr.
Kling could not recall the details regarding
the letter that Diaz had written to his
brother the night before the murder.

The prosecutor accused Dr. Kling of changing
his mind because the prior attorney, Ken
Garber, called him over and over again to get
a better answer. Even though the objection
to that question was sustained, there was no
motion to strike or motion for mistrial. The
prosecutor was ultimately able to gain the
advantage and lead Dr. Kling into telling the
jury that Joel Diaz suffered from an
"ungovernable temper."

(Doc. 1 at 22–23) (citations to the record omitted). Diaz now
argues that "Dr. Kling's credibility was destroyed, and defense
counsel did nothing to rehabilitate him." (Doc. 2 at 42.)

Diaz raised this ineffective assistance claim in his Rule
3.851 Motion, and the postconviction court concluded that Diaz
failed to satisfy either Strickland prong because Diaz had not
specified how more preparation "would have changed Dr. Kling's
truthful testimony[.]" (Ex. C84 at 13410). The postconviction
court noted that Dr. Kling testified at the evidentiary hearing
that, even if better prepared, he would not have testified
differently at trial. (Id.) The Florida Supreme Court agreed:

23

> We agree with the postconviction court's
> conclusion that Diaz did not satisfy either
> prong of Strickland. Dr. Kling's admission
> during the evidentiary hearing that he "could
> have done a better job" when he testified at
> trial does not satisfy the deficient
> performance prong. Dr. Kling's testimony at
> the evidentiary hearing that the additional
> information presented to him regarding Diaz
> would not have changed his testimony indicates
> that trial counsel gave Dr. Kling sufficient
> information to evaluate Diaz.

Diaz II, 132 So. 3d at 107. The court further concluded that

Diaz's allegations of prejudice were vague and conclusory. Id.

at 108. Diaz does not explain how the state courts' adjudication

of this claim were contrary to Strickland or based upon an

unreasonable determination of the facts in light of the evidence

presented in the state court proceedings.

A review of Dr. Kling's testimony at trial and at the

evidentiary hearing supports the state courts' conclusions. At

trial, Dr. Kling testified that he had initially determined that

Diaz was not legally insane at the time of the crime, but after

reviewing depositions of Lissa Shaw, Barbara Shaw, and Deborah

Wilson, he reached a different conclusion. (Ex. A-9 at 543) Dr.

Kling opined that Diaz was legally insane when he murdered Charles

Shaw and shot Lissa Shaw. (Id. at 547) The state vigorously

cross-examined Dr. Kling (id. at 547-67), and although he admitted

that he was unaware of certain facts surrounding the crimes, the

doctor did not change his opinion that Diaz was insane at the time

of the shootings. (Id. at 566). At the evidentiary hearing on

24

Diaz's Rule 3.851 Motion, Dr. Kling testified that he had testified truthfully at trial and still had not changed his mind about Diaz's sanity.  (Ex. C96 at 657).

Supporting and underscoring the state courts' determination that Diaz cannot demonstrate Strickland prejudice from trial counsel's alleged failure to better prepare Dr. Kling to testify is Porter's admission at the evidentiary hearing that, even though an insanity defense was "Mr. Diaz's best and probably only chance of success," a favorable verdict would be difficult "[b]ecause the facts of the case stunk.  The doctors' reports were not consistent.  But we did have one doctor that said that he was insane at the time of the offense, and that was about the only thing that we had to hang our hat on[.]"  (Ex. C94 at 343).

Given Dr. Kling's statement that he would have not testified differently even if apprised of more facts and given Porter's comment on the weakness of Diaz's self-defense argument, the state courts did not unreasonably conclude that Diaz did not show Strickland prejudice from Porter's failure to better prepare Dr. Kling to testify at trial.  Nor has he shown that the state courts' conclusions were based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Diaz is not entitled to federal habeas relief on subclaim (b).

####         (e)    Porter was not ineffective for failing
              to interview Melissa Plourde before trial
              or call her as a witness at trial.

Diaz asserts that trial counsel was constitutionally ineffective for failing to interview his friend Melissa Plourde[6] before trial because "she could have corroborated [Diaz's] self report about his state of mind prior to the offense." (Doc. 2 at 40)  Diaz asserts that, after he broke up with Lissa Shaw, he "uncharacteristically quit his job and became more and more depressed" and when "[Ms. Plourde] talked to him the night before the crime, he sounded depressed and not like himself." (Id.)  Ms. Plourde's testimony "went directly to a state of mind defense and would have been relevant in either the guilt or the penalty phase of the trial." (Id.)

Diaz raised this claim in his Rule 3.851 Motion, and the postconviction court denied it on both Strickland prongs.  The postconviction court noted that Ms. Plourde testified at the Rule 3.851 evidentiary hearing to witnessing Diaz hit Lissa Shaw after accosting her in the Western Auto parking lot.  (Ex. C84 at 13407).  The court concluded that any testimony from this witness regarding Diaz's state of mind would have been cumulative to that of other

---

[6] Melissa Plourde was known as Melissa McKemy at the time of Diaz's trial.  (Ex. C97 at 192).  The postconviction court incorrectly refers to this witness as Melissa Forde.  (Ex. C84 at 13407–408).  To avoid confusion, this Court will exclusively use the name "Melissa Plourde" or "Ms. Plourde" when referring to this potential witness.

witnesses at trial, and that her "testimony regarding the Western Auto incident would have been harmful" to Diaz.  (Id. at 13408). Moreover, Porter testified at the evidentiary hearing that he would not have called Ms. Plourde as a witness "if she had negative testimony just because [Diaz] wanted her as a witness." (Id.)

The Florida Supreme Court affirmed the postconviction court's ruling:

> We agree with the postconviction court's conclusion that trial counsel did not perform ineffectively by failing to interview a potential witness who would have provided cumulative and harmful testimony. At the evidentiary hearing Plourde testified that Diaz was depressed following his break up with Lissa Shaw and that he had quit his job. She also testified about Diaz assaulting Lissa Shaw in the parking lot of a Western Auto store after their break up. Plourde said that while she was driving with Diaz, he saw Lissa Shaw's car pull into the parking lot of Western Auto and he asked Plourde to pull in so he could speak to Lissa Shaw. Plourde dropped Diaz off and circled around the parking lot. When she returned she saw Diaz hit Lissa Shaw.
>
> This Court has "held that counsel does not render ineffective assistance by failing to present cumulative evidence." Farina v. State, 937 So.2d 612, 624 (Fla.2006). Further, counsel is not ineffective for deciding not to call a witness whose testimony will be harmful to the defendant. See Johnston v. State, 63 So.3d 730, 741 (Fla. 2011). Here, Plourde's testimony would have been both cumulative regarding Diaz's depression and harmful because she would have testified about the domestic abuse.
>
> Furthermore, Diaz would not have obtained a more favorable result as a result of trial counsel having interviewed Plourde.

> Interviewing her would not have prevented her
> testimony from being harmful to Diaz.
> Accordingly, Diaz is not entitled to relief on
> any of his guilt phase ineffective assistance
> of counsel claims.

Diaz II, 132 So. 3d at 109.  Diaz now argues that this finding was

not reasonable.  (Doc. 2 at 41).  He asserts that "instead of

addressing the failure to investigate, the state court conflated

the two prongs and accepted the prosecutor's post hoc

rationalization as to why [Ms. Plourde's] testimony may have been

negative."  (Doc. 2 at 40).  Diaz argues that "[i]t is an

unreasonable application of Strickland to accept excuses for

failure to investigate offered in hindsight as strategic decision

making."  (Id.)

     Diaz appears to misunderstand his burden under Strickland.

He cannot merely argue that Porter's decision not to investigate

Ms. Plourde was unreasonable; he must demonstrate that no competent

counsel would have decided against using her as a witness.

Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

The Eleventh Circuit has explained:

> The test has nothing to do with what the best
> lawyers would have done. Nor is the test even
> what most good lawyers would have done. We ask
> only whether some reasonable lawyer at the
> trial could have acted, in the circumstances,
> as defense counsel acted at trial. . . . We
> are not interested in grading lawyers'
> performances; we are interested in whether the
> adversarial process at trial, in fact, worked
> adequately.

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  By
stating that "counsel is not ineffective for deciding not to call
a witness whose testimony will be harmful to the defendant," the
state court implicitly determined that some reasonable, competent
counsel could have decided against presenting Ms. Plourde's
testimony at trial because it would have been cumulative to
evidence already presented and/or potentially harmful.  In other
words, it does not matter whether Porter strategically decided
against offering Ms. Plourde's testimony—it matters only that some
competent counsel could have done so.

A review of the Rule 3.851 evidentiary hearing testimony
supports the state courts' rejection of this claim.   At the
hearing, Ms. Plourde testified that she spoke to Diaz the night
before the crimes and that "he sounded depressed and just
different.  Not himself."  (Ex. C97 at 191).  She thought he might
be suicidal.  (Id.)   She also testified that she saw Diaz hit
Lissa Shaw in a Western Auto parking lot some days before he killed
Charles Shaw.  (Id. at 194).  Porter testified at the hearing that
he could not recall whether he had spoken with Ms. Plourde prior
to trial.  (Ex. C95 at 408).  However, he stated that he would not
have called her as a witness if she had evidence that would have
been detrimental to Diaz.  (Id. at 433-34).

Ms. Plourde's testimony was unnecessary to show that Diaz was
depressed before the murder.  He testified that he was depressed

after he and Lissa Shaw separated.  (Ex. A9 at 582, 584).  Diaz's brother testified at trial that Diaz was depressed about his break-up with Lissa Shaw, and that he was depressed and quiet on the morning of the murder.  (Id. at 472-73, 489-90).  Therefore, the state courts reasonably concluded that Ms. Plourde's testimony regarding Diaz's state of mind would have been cumulative to testimony already presented.  See Glock v. Moore, 195 F.3d 625, 636 (11th Cir. 1999) (finding that, "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial," the petitioner could not show prejudice); Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative.")  Likewise, reasonable competent counsel could have decided against offering potentially damaging testimony about a previous altercation with one of the victims that underscored Diaz's violent tendencies. See Jackson v. Sec'y, Dep't of Corr., No. 19-11704-D, 2019 WL 8646045, at *1 (11th Cir. 2019) (counsel's decision to avoid potentially damaging evidence was "not outside the scope of what a reasonable attorney would have done.") (citing Chandler, 218 F.3d at 1313).

The state courts' rejection of this claim was neither contrary to Strickland nor based upon an unreasonable determination of the

facts.  Diaz is not entitled to federal habeas relief on subclaim (e).

### 2. Subclaim(c):  Trial counsels' failure to object to Dr. Keown's Anger Styles Quiz

Diaz suggests that Porter was constitutionally ineffective for failing to conduct "research regarding the reliability or validity of the Anger Styles Quiz prior to trial even though it was his job to challenge the State's evidence."  (Doc. 1 at 18). Prior to trial, the circuit court appointed Psychiatrist Richard Keown to evaluate Diaz.  (Id. at 17–18).  Porter obtained a copy of Dr. Keown's report which included the results of an "Anger Styles Quiz" that the doctor had administered to Diaz.  (Id. at 18).  The report showed that Diaz "showed a strong tendency to mask his anger" and "a pattern of harboring a great deal of hatred." (Id.)  Dr, Keown's report also stated that Lissa Shaw described Diaz as very controlling and "threatening and physically abusive as well as unpredictable in terms of when he might get angry." (Id. at 18).

Diaz raised this claim of ineffective assistance in his Rule 3.851 motion, and it was rejected by the postconviction court. (Ex. C84 at 13404–405).  The postconviction court noted that Diaz had not alleged a basis for objecting to the results of Dr. Keown's report and failed to allege prejudice from the report.  (Id. at 13404).  Diaz appealed the postconviction court's ruling, and the Florida Supreme Court denied the claim as follows:

31

Diaz claims that trial counsel were ineffective for failing to object to Dr. Keown's testimony and report regarding the Anger Styles Quiz. Diaz argues that the postconviction court erred in concluding that he did not allege the deficiency or prejudice prong of Strickland in his motion. He further argues that the court overlooked the argument he made in his written closing argument, submitted following the evidentiary hearing.

Diaz's allegations in his motion do not assert on what basis reasonable counsel would have objected to the admission of the evidence or how he was prejudiced as a result, even though he later argued that trial counsel should have objected based on Frye. Even assuming that Diaz presented a facially sufficient claim on this issue, Diaz was not prejudiced by Dr. Keown's testimony and report regarding the Anger Styles Quiz because the evidence was not inconsistent with the defense's theory. Diaz's defense did not dispute that he shot his ex-girlfriend and killed her father. Instead, the defense attempted to demonstrate that Diaz was insane and lacked the premeditation necessary to be guilty of first-degree murder. In fact, the defense presented similar testimony about Diaz's temper from Dr. Kling. Accordingly, Diaz is not entitled to relief on this claim because he has failed to demonstrate the prejudice prong of Strickland.

Diaz , 132 So. 3d at 108. Diaz argues that "[r]aising insanity as a defense does not give the State's expert a free license to pontificate endlessly about the bad character of the accused. Trial counsel's failure to object was deficient." (Doc. 2 at 45). Diaz further claims that the testimony "ultimately operated as a non-statutory aggravator pushing the jury toward a death recommendation." (Id.)

A review of the record supports the state courts' conclusion that Diaz cannot demonstrate Strickland prejudice at the guilt phase of his trial from Porter's failure to object to the admission of the results of Dr. Keown's Anger Styles Quiz.  First, no expert was necessary for the jury to conclude that Diaz had a very serious anger problem; he shot his former girlfriend and murdered her father.  Moreover, Diaz testified that he "lost it" when Mr. Shaw struggled with him in the garage after Diaz had shot at Lissa.  (Ex. A10 at 620).[7]  Next, Diaz's own expert testified to Diaz's violent temper on cross-examination.  (Ex. A9 at 572).  When doing so, his expert also testified that Diaz's rage was consistent with a finding of insanity on the day of the crime.  Specifically, Dr. Kling testified:

> I think most people when something like this happens and they're extremely agitated and enraged and out of control, they believe that what they're doing is correct; they justify it.  I mean, they think they're doing the right thing for whatever reason it may be.  So at that time, given his emotional state, I think that he thought he was doing the right thing or at least a necessary thing.

_____

[7] Diaz also contends that Counsel could have objected to the report on the ground that it "contained irrelevant and damaging information."  (Doc. 2 at 46).  Specifically the report concluded that "[Joel Diaz] could be threatening and physically abusive as well as unpredictable in terms of when he might get angry."  (Doc. 2 at 46).  Again, the jury had sufficient evidence from Diaz's own testimony and actions to reach this conclusion.  No report was necessary.

(Id. at 546).   Finally, although Diaz now argues that the Anger Styles Quiz would not pass a Frye challenge[8] (Doc 2 at 45), this argument is based upon mere speculation—Diaz provides no support for the assertion.   Hill v. Lockhart, 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

The state courts reasonably concluded that Diaz has demonstrated neither deficient performance nor Strickland prejudice from trial counsel's failure to object to the Anger Styles Quiz.   Nor has Diaz shown that the state courts' conclusions were based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, he is not entitled to federal habeas relief on subclaim(c).

**B.   Ground III (Juror Misconduct Claim)**

Diaz claims that he was deprived of his constitutional right to a fair and impartial jury due to juror misconduct and the state's failure to disclose material information concerning a

---

[8] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923) (holding that expert testimony must be based on scientific methods that are sufficiently established and accepted).

juror's background and criminal history. (Doc. 1 at 47).
Specifically, Diaz asserts that during the course of collateral
litigation, he discovered that the foreperson of his jury, Sherri
Smith Williams ("Williams"), failed to disclose during voir dire
that she had been arrested for domestic battery and that she "had
participated in rallies and parades for victims of domestic
violence." (Doc. 2 at 70). He urges that, because Williams
served as a juror, he was deprived of his Sixth Amendment right to
a fair and impartial jury under Irwin v. Dowd, 366 U.S. 717, 721
(1961) or, alternatively, the state failed to disclose material
evidence, in violation of Brady v. Maryland, 373 U.S. 83, 87
(1963).

Diaz raised these claims for the first time in his Rule 3.851
Motion, and the postconviction court addressed their merits:[9]

> Defendant argues that juror misconduct
> rendered the outcome of his trial, and his
> sentence, unreliable, and violated his due
> process rights. Defendant argues that juror
> foreperson, Sherri Smith Williams, concealed
> relevant "personal and professional
> experiences" during voir dire. Specifically,
> he claims that Ms. Williams stated during voir
> dire that she was a professor of criminal
> justice at FGCU, she had been the victim of a
> home invasion robbery and had sought an
> injunction in the past. However, through
> public records, Defendant subsequently
> learned that Ms. Williams taught a domestic
> violence course in 1998, she "has been a

---

[9] When addressing Diaz's Rule 3.851 Motion, the state argued
that a number of Diaz's claims were procedurally barred. (Ex. C7
at 750–51). However, the state did not argue that Diaz's juror
misconduct claim was procedurally barred. (Id. at 753–54).

domestic violence counselor," she has "participated in events on behalf of battered women;" she interned for the department of corrections in another state; she has been a "Certified Domestic Violence Trainer for Health Care Professionals;" and she failed to disclose her 1999 arrest for domestic battery or her completion of a diversion program. Finally, Defendant argues that the State had constructive knowledge of Ms. Williams' arrest, such that the State's failure to disclose it constituted a Brady violation.

Information is considered concealed for purposes of testing for juror misconduct due to concealment of information where the information is squarely asked for and not provided. Wiggins v. Sadow, 925 So. 2d 1152 (Fla. 4th DCA 2006). In order to establish juror concealment, the moving party must demonstrate, among other things, that the voir dire question was straightforward and not reasonably susceptible to misinterpretation. See Tran v. Smith, 823 So. 2d 210 (5th DCA 2002). A potential juror cannot and should not conceal information on voir dire or fail to answer questions completely, but where a juror correctly answers a question, it is counsel's responsibility to inquire further if more information is needed. Ottley v. Kirchharr, 917 So. 2d 913 (Fla. 1st DCA 2005).

While the trial court urged the jurors to be candid, the trial court did not require jurors to offer information that was not asked for. The panel was asked if anyone had been a victim of a crime, if a family or friend had been charged with a crime, and whether anyone had sought a restraining order or injunction against someone else. Neither the panel in general, nor Ms. Williams in particular, were asked if they had been arrested for any crimes or if injunctions or restraining orders had been taken out against them. Defendant has not established that Ms. Williams concealed information during questioning. She was not required to volunteer information, and she

truthfully answered all questions she was asked.

The Court is unable to find any portion of the record in which Ms. Williams stated she could not be neutral and unbiased. Defendant has not established that the domestic violence related information was material to Ms. Williams' service on the jury for a murder trial. While the issue of domestic violence between Defendant and his girlfriends was raised at trial, any such episodes were tangential to the jury's determination of whether Defendant murdered the victim, Mr. Shaw. Defendant's assertions that Ms. Williams was biased against Defendant or had some hidden agenda are mere speculation. Defendant has failed to demonstrate that juror misconduct occurred.

Defendant has failed to point to any specific question(s) that Ms. Williams failed to answer fully or truthfully. Instead, he appears to argue that it was Ms. Williams' responsibility to offer unsolicited, additional information about herself during voir dire and, when she failed to do so, the State had an obligation to inform the defense.

To establish a Brady violation, a defendant must show: (1) evidence favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice ensued. Guzman v. State, 868 So. 2d 498, 508 (Fla. 2003).

At the evidentiary hearing, Maria Gonzalez, who prosecuted this case, testified that she and the defense got the jury list on the morning of jury selection, as the jury panel was brought in. She further testified that she had no knowledge at that time that Ms. Williams had been arrested for domestic violence, had completed a diversion program prior to jury selection in which the charges were dropped, or any of the other information subsequently discovered by current defense

> counsel about Ms. Williams. Accordingly, this testimony refutes Defendant's allegations that the State had knowledge of this information. The State could not disclose information it did not possess.
>
> Even if the State is imputed with this knowledge, these issues were not material to Ms. Williams' service on the jury for a murder trial, the information Ms. Williams gave was not false, the information was not favorable to the Defendant, and there is no prejudice since this information does not undermine confidence in the outcome of the trial. See Guzman, 868 So. 2d at 505-508. The Court finds no . . . Brady violation[] occurred on this issue.

(Ex. C84 at 13389-92(internal citations omitted) (reformatted for readability)). On appeal, the Florida Supreme Court separated Diaz's juror misconduct claim into two categories: (1) juror misconduct claims based on Williams' failure to reveal allegedly relevant information during voir dire; and (2) a Brady claim based on the state's alleged constructive knowledge of Williams' criminal history and its failure to disclose it.

Instead of addressing Diaz's juror misconduct claims on the merits, the Florida Supreme Court concluded that they were procedurally barred because Diaz could have raised any claims related to Williams' failure to disclose her arrest on direct appeal instead of in the Rule 3.851 Motion. Diaz II, 132 So. 3d at 105. Thus, the court concluded that "each of these claims is now procedurally barred." Id. (citing Troy v. State, 57 So. 3d 828, 838 (Fla. 2011); Vining v. State, 827 So. 2d 201, 216 (Fla.

2002)).  Therefore, the Florida Supreme Court expressly rejected Diaz's juror misconduct claim on procedural grounds without reaching the merits of those claims.

A state court's rejection of a federal constitutional claim on procedural grounds precludes federal review if the state procedural ruling rests upon an "independent and adequate" state ground.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). Nothing suggests that the state court's rejection of the juror misconduct claim on procedural grounds was "arbitrary" or "manifestly unfair."  See Judd, 250 F.3d at 1313.  To the contrary, Florida courts routinely require postconviction claims of juror misconduct to be raised on direct appeal.  See, e.g., Elledge v. State, 911 So. 2d 57, 77 n. 27 (Fla. 2005) (finding Rule 3.851 claim of juror misconduct procedurally barred because any substantive claim pertaining to juror misconduct "could have and should have" been raised on direct appeal); Troy v. State, 57 So. 3d 828 (Fla. 2011) (citing Elledge for the proposition that allegations of juror misconduct must be raised on direct appeal).

To show cause for the procedural default of this claim, Diaz argues that "there is no evidence on the record that would establish that trial counsel either knew, or could have known that [Williams] lied and concealed information from the parties." (Doc. 2 at 72).  However, in a different case, the Florida Supreme Court recently explained this procedural ruling and expressly

found that Diaz could have easily discovered the alleged juror misconduct with diligence and could have been raised on direct appeal:

> In Diaz, the undisclosed facts were the juror's history of domestic violence charges and arrests, a restraining order issued against the juror, and the fact that the juror worked as a domestic violence counselor. Id. at 104. These undisclosed facts were all easily discoverable by trial counsel with diligence, meaning the asserted misconduct could have been raised on direct appeal.

Martin v. State, 322 So. 3d 25, 33 (Fla. 2021). The Court finds that Diaz has not shown cause for his procedural default.

Diaz also cannot demonstrate the requisite prejudice to excuse the default because he has not demonstrated a reasonable probability that the outcome of the proceeding would have differed had Williams volunteered information about her background. Crawford, 311 F.3d at 1327-28. When asked at the evidentiary hearing whether he would have struck Williams from the jury had he known about her past, Porter merely stated that "[i]t would have depended on the total makeup of the panel." (Ex. C95 at 425). Neil Potter stated that, in capital cases, "the more education you can get on the jury, the better it is. Because they have a better grasp of all these different legal concepts." (Id. at 544). Potter testified that he believed Professor Williams would be "[m]ore liberal and someone who probably is going to have a better grasp of the technicalities that are involved in a first degree

murder case." (Id. at 546).  Given Porter's reluctance to say that he would have removed Williams from the panel and Potter's desire to keep educated people such as Williams on the jury, Diaz cannot demonstrate that defense counsel would have sought to remove Williams from the panel, even had they known of her past.  Finally, the overwhelming evidence of Diaz's guilt militates against a finding of prejudice at the guilt phase of his trial—there is simply no chance that Diaz would have been found not guilty of the charges against him had a different juror been chosen.  Diaz has not demonstrated cause and prejudice for his procedural default and it is clear that the fundamental miscarriage of justice exception does not apply here.  Therefore, Diaz's juror misconduct claim is dismissed as procedurally barred.

Even if not procedurally barred, this claim would fail on the merits.  See 28 U.S.C. § 2254(b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")  Due Process requires that a defendant have "a jury capable and willing to decide the case solely on the evidence before it[.]"  Smith v. Phillips, 455 U.S. 213, 217 (1982); see also Peters v. Kiff, 407 U.S. 493, 501 (1972) (recognizing that a defendant has a "due process right to a competent and impartial tribunal").  The Supreme Court has held "that an impartial jury consists of nothing more than 'jurors who

41

will conscientiously apply the law and find the facts.' " Lockhart
v. McCree, 476 U.S. 162, 178 (1986) (quoting Wainwright v. Witt,
469 U.S. 412, 423 (1985)).

Diaz cites to McDonough Power Equip., Inc. v. Greenwood, 464
U.S. 548, 556 (1984) for the proposition that "[a] juror's false
response during voir dire which results in the nondisclosure of
material information relevant to jury service justifies a new trial
as a matter of law." (Doc. 2 at 77). This is not quite the
standard announced in McDonough. Rather, McDonough set forth a
two-prong test to determine when juror responses at voir dire
necessitate a new trial. The first prong of the McDonough test
requires a finding that the juror's answers were dishonest. 464
U.S. at 555. Next, the Court must determine whether a correct
response would have provided a valid basis for a challenge for
cause. Id. at 556.

This claim fails on McDonough's first prong. Diaz claims
that Williams "knew full well" that her failure to disclose her
arrest for domestic battery "could be cause for dismissal or the
basis for a peremptory challenge by the defense." (Doc. 2 at 74).
Although he asserts that Williams "lied and concealed information
from the parties," Diaz does not provide an affidavit from Williams
explaining her answers nor does he point to a single question that
Williams failed to answer truthfully, and the Court on its own

42

review finds none.[10]  During the introduction phase of voir dire, the trial court asked the jurors how long they had lived in Lee County, the type of work they and their family members did, whether they had children, and whether they had ever sat on a jury. (Ex. A7 at 29).  Williams answered the judge's questions as follows:

> Sherry Smith Williams.  I'm a college professor.  I teach at Florida Gulf Coast, Criminology and Criminal Justice.  I've been in Lee County for five years.  Prior to that, I was a student at Florida State.  I'm divorced.  I have not served on a jury, but obviously I have been a witness to various legal proceedings.

(Id. at 32)  Williams affirmed that she would be able to "set those things aside and serve as a juror in this case." (Id.)  The judge asked whether any juror had been a victim of a crime, and Williams stated that she was a victim of a home invasion, but affirmed that it would not affect her ability to be objective and impartial in this case. (Id. at 54).  When asked whether any prospective juror had family members involved in law enforcement, Williams volunteered that she served on advisory committees with

---

[10] Notably, in its order denying Diaz's Rule 3.851 Motion, the postconviction court explicitly determined that Ms. Williams did not conceal information and "truthfully answered all questions she was asked." (Ex. C84 at 13390).  Generally, factual determinations from the state court are entitled to a presumption of truth on federal habeas review. 28 U.S.C. § 2254(e)(1).  While it is unclear whether section 2254(e)(1)'s presumption still applies after the Florida Supreme Court declined to address this claim on the merits, the record supports the state court's findings, and the postconviction court's factual conclusions underscore and support those reached by this Court.

law enforcement and had a variety of students in law enforcement. (Id. at 70).  Williams volunteered that she had shot her gun at a home invader.  (Id. at 107).  When asked whether she had ever been in a relationship that did not work out, she replied, "obviously, yes.  I'm divorced."  (Id. at 120).  She agreed, when asked that there is both a "violent and nonviolent way of handling" relationships.  (Id. at 120)  When asked about the death penalty, Williams stated that she "would like to think I'm always neutral and remain objective."  (Id. at 175).

Given that the record shows that Williams truthfully answered the questions posed to her, Diaz has not stated a claim under McDonough or any other clearly established federal law.  Although Diaz argues that the questions from the trial court and the attorneys were designed to evoke additional responses from the veniremen, he fails to provide evidence proving that Williams' failure to affirmatively volunteer information regarding her arrest, her volunteer activities, or her employment issues amounts to concealment.  Even if this claim was not procedurally barred, it would fail on the merits.

Diaz fares no better on his claim that the state committed a violation under Brady v. Maryland by withholding information on Williams' background.  Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt

or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.   In Strickler v. Greene, the United States Supreme Court explained that a Brady violation has three essential elements:  (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material—it must have prejudiced the defense at trial. Strickler, 527 U.S. 263, 281–82 (1999).

The Florida Supreme Court addressed Diaz's Brady claim on the merits and affirmed the postconviction court's rejection as follows:

> Even assuming that the State had constructive knowledge of Williams' arrest and restraining order because she was enrolled in the State Attorney's Office's pretrial diversion program, Diaz has failed to demonstrate that the evidence was favorable and that he was prejudiced, as required by Brady. First, Diaz has not shown that evidence related to juror Williams' prior domestic violence arrest and restraining order is favorable to him. It is neither exculpatory nor impeaching.
>
> Second, Diaz has failed to demonstrate that he suffered prejudice. "The test for prejudice or materiality under Brady is whether, had the evidence been disclosed, there is a reasonable probability of a different result, expressed as a probability sufficient to undermine confidence in the outcome of the proceedings." Guzman v. State, 868 So.2d 498, 508 (Fla. 2003).  Diaz's claim that trial counsel would have sought to strike Williams for cause based on her arrest and restraining order is not persuasive. Defense attorney Potter testified at the evidentiary hearing that he would not have challenged juror

> Williams. He explained that the defense
> wanted Williams on the jury because she was a
> college professor. Additionally, Diaz has not
> explained how Williams' presence on the jury
> could have been prejudicial. In light of the
> overwhelming evidence of Diaz's guilt in this
> case, Diaz has not established that Williams'
> presence on the jury undermines confidence in
> the verdict or sentence. It was undisputed
> that Diaz killed Charles Shaw and shot Lissa
> Shaw, and the sentencing order stated that any
> single aggravating factor in this case
> outweighed all of Diaz's mitigation.
> Accordingly, Diaz is not entitled to relief on
> any of his jury related claims.

Diaz II, 132 So. 3d at 105–06. Diaz does not explain how the state court's adjudication of this claim was contrary to or based upon an unreasonable application of Brady or Strickler.

Upon review of the record, this Court agrees with the Florida Supreme Court that, even if constructive knowledge of Williams' arrest could be imputed to the state, Diaz has not satisfied the first or third Strickler prongs. The fact that Williams had been arrested for domestic battery was neither exculpatory nor impeaching. Likewise, the evidence was not material in the sense that it would not have created a reasonable probability of a different result either at the guilt or penalty phases of Diaz's trial. Strickler, 527 U.S. at 291. To the extent Diaz argues that Williams could not be impartial because of her domestic violence arrest, Diaz was charged with the murder of Charles Shaw and the attempted murder of Lissa Shaw, not domestic battery. Diaz has offered no support for his assertion that a person

convicted of an unrelated crime is _per se_ foreclosed from jury service.  See also discussion _supra_ (concluding that Diaz could not show prejudice sufficient to excuse the procedural default of his juror misconduct claims).

Even assuming, without finding, that _Brady_ can apply to a state's alleged failure to offer information about a juror's background during voir dire, Diaz has not shown that the state court's adjudication of this claim was contrary to _Brady_ or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Diaz is not entitled to relief on this claim

### IV.  Conclusion

Based on the foregoing, the Court concludes that Diaz is not entitled to relief on the habeas claims presented here. Petitioner's penalty-phase claims are denied as moot. Petitioner's guilt-phase claims are procedurally defaulted or denied on the merits.  Any allegation not specifically addressed has been fully considered and is denied on the merits.

Because the Court was able to resolve the petition on the basis of the record, an evidentiary hearing is not warranted.  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

Accordingly, it is **ORDERED** that:

1.   The 28 U.S.C. § 2254 petition filed by Joel Diaz is **DENIED in part and DISMISSED in part** as set forth above.

2.   The Clerk is **DIRECTED** to enter judgment, deny any pending motions as moot, terminate any deadlines, and close this case.

### Certificate of Appealability[11]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the issues presented were 'adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

When, as here, the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of

---

[11] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Id.

reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

Upon consideration of the record as a whole, the Court will deny a certificate of appealability. Because Diaz is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE AND ORDERED** in Fort Myers, Florida on the __27th__ day of September 2021.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


SA:  FTMP-2

Copies furnished to:
Counsel of Record
Unrepresented Parties